**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| Rose Thomas, | ) | Case No. 25-01000 |
| | ) | |
| Debtor. | ) | Hon. Michael B. Slade |
| | ) | |

**MEMORANDUM OPINION SANCTIONING THE CITY OF HARVEY
FOR ITS VIOLATIONS OF THE DISCHARGE INJUNCTION
[Re: Docket Nos. 26, 27, 42, 49, 52, 61, 62]**

This case presents the most egregious violation of the discharge injunction that I have ever encountered. The City of Harvey did not just attempt to collect a discharged debt from a former debtor who resides there; that would be violation enough. It also turned off that former debtor's water within weeks of her discharge and failed to restore water service for *nine months*. And the City did so despite being repeatedly advised by its own outside counsel that such conduct was unlawful. City employees at various levels, in multiple offices, ignored Ms. Thomas's pleas to restore her water, disregarded several federal court orders (including an order to show cause why the City should not be sanctioned for these very violations), took a shockingly lackadaisical approach to remedying its violations, and have done literally nothing to ensure that such violations do not recur.

As a result, Ms. Thomas had no running water in her home for 273 days, including through the Chicago winter. And since then, Harvey has done nothing to rectify its failures of process and governance—despite being informed at a court hearing seven months ago that it must have procedures in place to comply with federal law when dealing with its customers in bankruptcy. The facts of this case are outrageous, and I sanction the City of Harvey in the ways and for the reasons set forth below.

All municipalities and utilities would do well to read this opinion and affirmatively review their internal policies to ensure they have adequate procedures to avoid violating the Bankruptcy Code's statutory injunctions and residents' due process rights. If they don't, courts like this one will enforce the law by sanctioning them when the law is violated.

I.

Rose Thomas has lived at 20 East Wells in Harvey, Illinois, for over 50 years. (Tr. 14)[1] When she filed a voluntary Chapter 7 petition on January 23, 2025 (Dkt. No. 1), she identified 20 East Wells on her bankruptcy schedules as a property on which she was heir to her parents. (Dkt. No. 14, Sch. A/B § 1) She claimed any interest she had in the property as exempt. (*Id.* Sch. C § 1) And she scheduled a $1,000 claim for the Harvey Water Department. (DX 1 § 4.11)

The Chapter 7 case proceeded normally, like hundreds of Chapter 7 cases do every day. The Chapter 7 Trustee filed a no asset report (Dkt. No. 19), Ms. Thomas received a discharge on April 22, 2025 (DX 2, the "Discharge Order"), and the case was closed days later (Dkt. No. 24). The City of Harvey received notice of Ms. Thomas's discharge by first class mail sent April 24, 2025, to 15320 Broadway Ave., Harvey, IL 60426-3396. (Dkt. No. 23, Cert. of Notice, at 1) Harvey's Water Department Supervisor confirmed that 15320 Broadway is the correct address. (Tr. 105–06)

Yet after Ms. Thomas received her discharge, Harvey continued to bill her for old debt that had accrued before her bankruptcy filing. (Tr. 16) On May 1, 2025, Harvey billed Ms.

[1] These are my findings of fact and conclusions of law following trial. *See* Fed. R. Bankr. P. 7052, 9014. At trial, Ms. Thomas testified on her behalf, and counsel for Ms. Thomas called one current Harvey employee (Sabrina King) and one former Harvey employee (Maria Gandarilla) to testify, too. The trial transcript is available at Dkt. No. 62 (the "Tr."). I also admitted the Debtor's Exhibits ("DX") 1–30 (Dkt. Nos. 56-1–56-30) and Harvey's Exhibits ("HX") 1-21 (Dkt. No. 57-1–57-21). In addition, I take judicial notice of my docket for purpose of discussing what happened in this Chapter 7 case before Ms. Thomas filed her motion for sanctions. *See, e.g.*, *In re Kimball Hill, Inc.*, 620 B.R. 894, 901 (Bankr. N.D. Ill. 2020), *aff'd sub nom. Fid. & Deposit Co. of Maryland v. TRG Venture II, LLC*, No. 20 C 6105, 2022 WL 952737 (N.D. Ill. Mar. 30, 2022), *aff'd sub nom. In re Kimball Hill, Inc.*, 61 F.4th 529 (7th Cir. 2023).

Thomas for water, sewer, and refuse collection, and included in that bill all of her past-due charges—that entire amount was due before, and discharged in, her bankruptcy case. (DX 9; *see* Tr. 16–17, 57–59, 112–13) That bill warned Ms. Thomas that "WATER SERVICE WILL BE DISCONNECTED IF NOT PAID BY 25TH OF THIS MONTH." (DX 9)

Turning off someone's water is an affirmative, manual task. (Tr. 75–76, 100–101) Here, Harvey turned off Ms. Thomas's water on May 21, 2025 (Tr. 18–19, 113). I note that this is even *before* the May 25 payment deadline it had threatened in violation of the discharge injunction.

That same day, discovering that her water had been turned off, Ms. Thomas went to Harvey's City Hall to address the issue. She was referred to the Water Department's then-clerk (now supervisor) Sabrina King and complained that her water had been turned off despite her bankruptcy discharge. (Tr. 18–19) Ms. Thomas showed Ms. King the Court's Discharge Order. (*Id.* (referring to DX 2); *see* Tr. 35–36) Ms. King advised that Ms. Thomas's bankruptcy was not recorded in the Water Department billing system and that her then-boss, Ms. Gandarilla, needed to address the issue; so Ms. Thomas waited forty-five minutes for Ms. Gandarilla. (Tr. 19–20) Ms. Gandarilla advised Ms. Thomas that she "hadn't received the notice" and refused the Order, without recording Ms. Thomas's discharge in the Department's system or rectifying the violation (or otherwise escalating Ms. Thomas's disconnection challenge for resolution). (Tr. 20)

Ms. Thomas then called the city clerk's office and filed a complaint with the mayor's office—twice. (Tr. 20–21) Ms. Thomas was told that her complaint would be passed along and that someone would get back to her. (*Id.*) But no one ever did. (*Id.*; *see also* Tr. 35–36) Ms. Thomas also testified that she separately sent an email to the Harvey Water Department on May 21, 2025, the day her water had been disconnected. (*Id.* 21, 37). But no one responded to that inquiry, either.

After shutting off Ms. Thomas's water and rejecting her initial pleas, Harvey continued to send her monthly water bills that included demands for payment of discharged debts. (Tr. 59–66; *see* DX 10–16) And in response to my questions at trial, the supervisor of the Harvey Water Department confirmed that Harvey continued to bill Ms. Thomas for additional monthly water service every month even though the water had been turned off; the City of Harvey wasn't actually providing water service to Ms. Thomas, but charged her anyway. (Tr. 61–62)

That summer, two other debtors showed up at the Harvey Water Department to complain about receiving bills for charges discharged in their bankruptcies. In both instances, Ms. Gandarilla asked the City's outside counsel for help in addressing the customers' Discharge Orders. (Tr. 109–110, 115; *see* DX 3, 4) In emails sent in August and September 2025, the City's outside counsel confirmed that the debts were discharged and the City of Harvey could not pursue collection, and Ms. Gandarilla confirmed she understood the rules. (Tr. 110–111, 115; *see* DX 3, 4) These queries, moreover, were not the first time Ms. Gandarilla had heard these rules. On February 4, 2024 (before disconnecting Ms. Thomas's service), Ms. Gandarilla learned from one of her subordinates that if a debt was discharged in a bankruptcy, the Water Department could not shut off service for non-payment of those amounts. (Tr. 107–109; DX 5)

On September 3, 2025, Ms. Thomas called Ms. Gandarilla again to complain. (Tr. 23) In response, Ms. Gandarilla asked Ms. Thomas to send her another copy of the Discharge Order and advised that Ms. Gandarilla would look into the matter and get back to her.[2] (*Id.*) As requested, Ms. Thomas sent Ms. Gandarilla another copy of the Court's Discharge Order. (DX 17) But again, no one at the City of Harvey responded to Ms. Thomas. (Tr. 37–38, 122–23)

---

[2] At this point, Ms. Gandarilla was simultaneously dealing with two other identical situations. I do not understand why she had to consult outside counsel each time the same question arose, but the fact that she did speaks to the dire need for the City of Harvey to implement a policy and procedure that educates Water Department employees and ensures consistent application.

Instead, and despite having just fielded similar inquiries, Ms. Gandarilla (then manager of the Water Department) forwarded Ms. Thomas's email with a copy of her Discharge Order to the City's outside counsel. (DX 18 at COH 423) She asked "is this valid and how do we proceed." (*Id.*) In response, the City's counsel again explained that a bankruptcy discharge results in Harvey's pre-petition debt being discharged and that the City had to "bring her balance to $0.00" for all pre-petition debts. (*Id.* at COH 422) But yet again, the City took no action—even though Ms. Thomas's water had already been turned off for over four months. (Tr. 69–72)

In December 2025, Ms. Thomas took it upon herself to enforce her rights. She lacked counsel and used Google to figure out what to do; it took her two full days to research, draft, and file a motion to reopen her bankruptcy (*see* Tr. 23–24) on December 4, 2025 (*see* Dkt. No. 26). Ms. Thomas served her motion by U.S. mail on five people associated with the City of Harvey. (*Id.* at p. 2) Ms. Thomas also served five different City of Harvey-related email addresses. (*Id.*) Her motion described, in straightforward terms, how her water was turned off based on a discharged debt. (*Id.* ¶¶ 1–6) She asked me to reopen her bankruptcy "[t]o allow her to file a Motion for Contempt and Sanctions," to "restore water service, stop billing, and award compensation and damages," and "[t]o impose willful damages for willful violation." (*Id.* ¶ 7) She attached to her motion several bills that corroborated her allegations. (*Id.* at PDF p. 6–9)

Harvey received Ms. Thomas's motion to reopen. (DX 21; Tr. 24) Indeed, the same day that Ms. Thomas filed and served it, Harvey's Deputy City Clerk, Liliana Gonzalez, forwarded Ms. Thomas's motion to Harvey's City Attorney, Keri-Lyn Kraftheher, and Harvey's outside counsel, via email. (DX 21) But no one filed a response to Ms. Thomas's motion to reopen and no one appeared at the hearing on the motion. Nor did anyone respond to Ms. Thomas's email. (Tr. 25) Nor did Harvey turn Ms. Thomas's water back on. (*Id.*)

On December 22, 2025, I entered two orders. I reopened Ms. Harvey's Chapter 7 case to "address enforcement of the discharge injunction against [the] Harvey Water Department." (Dkt. Nos. 29, 31) And I entered an Order to Show Cause, directing Harvey to "show cause as to why it should not be sanctioned for violating the discharge injunction imposed by 11 U.S.C. § 524." (Dkt. No. 27) I gave Harvey time to respond and scheduled a Show Cause hearing that was ultimately held on February 9, 2026. (*Id.*)

Harvey initially took the position that it didn't violate the discharge injunction because its bills only sought in rem remedies based on discharged debt. (*See* Dkt. No. 35) I rejected Harvey's argument in an oral ruling at the Show Cause hearing (Dkt. No. 43) and Harvey has apparently abandoned that argument—for good reason.

At the Show Cause hearing on February 9, 2026, I described that by turning off Ms. Thomas's water and continuing to bill her for prepetition debts, the City of Harvey had violated my Discharge Order and the discharge injunction imposed by 11 U.S.C. § 524. (Dkt. No. 43 at 4–6 (citing cases)) I also told Harvey I was likely to impose sanctions if it turned out that it had no formal process in place to ensure that it respects the discharges obtained by its residents when they file for, and emerge from, bankruptcy. (*Id.*) I scheduled an evidentiary hearing to assess damages. (Dkt. No. 42, 52) Counsel from Jenner & Block LLP then graciously agreed to represent Ms. Thomas at her damages trial and did so effectively. (Dkt. Nos. 45–47, 59-60)

A transcript of the Show Cause hearing was docketed on February 13, 2026. (Dkt. No. 43) Ms. Thomas's water service was restored on February 18, 2026 (Tr. 25)—fifty-eight days after I issued the Order to Show Cause, nine days after the Show Cause Hearing, and five days after the Show Cause Hearing transcript hit the docket. By that time, Ms. Thomas had been without running water in her home for 273 days.

II.

Three witnesses testified at the evidentiary hearing held on July 27, 2026. Ms. Thomas described her repeated efforts to get Harvey to turn her water back on. She also described what she had to do to secure water while she was cut off. For nine months, Ms. Thomas (who is sixty-eight years old) took eleven or twelve empty five-gallon water jugs to friends' homes and filled them up, then lugged them to her car to take home and carry inside. (Tr. 26) Ms. Thomas did this "every couple of days" so that she could accomplish basic tasks like drink water, wash her hands, and use her toilet. (Tr. 27–29) To cook, Ms. Thomas spent $500 to buy bottled water—"a couple of cases every couple of days." (Tr. 27) Once she tripped and fell in the snow dragging her five-gallon water jugs home, causing one to break. (Tr. 29) Ms. Thomas also had to take particular care during the winter months to make sure that her pipes wouldn't freeze, which required her to flush gallons of (outsourced) water through the home's pipes. (Tr. 30)

Being without water at home for nine months took its toll. Ms. Thomas testified that it was "[s]tressful, [caused] a lot of anxiety, [and] caused [her] ulcers to flare up." (Tr. 31) It also affected her sleep. (Tr. 38) Ms. Thomas understated the difficulties: "[i]t was a lot, not knowing what to do to get on." (Tr. 31) "[I]t was just—it was rough." (*Id.* 33) And she found Harvey's refusal to deal with her situation insulting; it (understandably) made her angry. (*Id.* 31–32)

Ms. King, the current supervisor of the City of Harvey Water Department, and Ms. Gandarilla, the manager from 2023 until April 2026 (Tr. 42), provided testimony that put Ms. Thomas's travails in context. They candidly described how the City of Harvey currently can't even process mail successfully,[3] let alone ensure that it complies with its residents' rights.

[3] Ms. Gandarilla testified that when mail is sent (for example, by the Bankruptcy Noticing Center) to the City of Harvey at its official address, it simply goes to the City Clerk, who "files it away" (Tr. 105–07, 169–71) rather than forwarding the mail to the right department within the City or otherwise doing anything about the various notices served on the City. That is a very problematic policy, for obvious reasons.

The City of Harvey has no formal policy in place to deal with residents receiving services who are in, or recently completed, bankruptcy. (Tr. 48) It doesn't train employees about how to deal with residents in bankruptcy. (Tr. 42–43, 85–86, 104) While such a training was suggested, no one ever did anything about it. (*Id.* 43–44, 104) Harvey claims to have an "unwritten" policy about how to handle such situations, but the City's Water Department current and former leaders hadn't ever heard of, directed, or observed the execution of any such policy. (*Id.* 49, 104) Water Department employees don't know how to remove a prepetition balance from a discharged customer's account even if they wanted to. (Tr. 54–56, 71–74)

At best, when a clerk is alerted to a customer's bankruptcy, they sometimes write the word "Bankruptcy" in a drop-down comment box on the customer's page in the City's electronic billing software, BS&A. (Tr. 51) But the Water Department often doesn't see bankruptcy notices and other papers mailed to it, because as described above, they are received by the Deputy City Clerk and filed away in a mysterious location, not passed along to the Water Department as they should be. (Tr. 103, 105–107) Even when Water Department staff receive bankruptcy notices because a customer personally brings one to their attention, that does not always result in a "Bankruptcy" notation—as evidenced by Ms. Thomas's experience. And that notation has no apparent effect in any event. It doesn't change billing practices. The testimony suggests that if a supervisor checks an account before cutting off a customer's water, and if the supervisor sees the note that might be buried on the page and understands the implication, it *might* save the customer from a water service cutoff. (Tr. 51–54, 101–102) Fatally, the person apparently tasked with tracking customer bankruptcy filings is the Water Manager, but no person currently fills that role (Tr. 49–50) and thus there is no employee at the Water Department whose job description includes making the "Bankruptcy" notation in the City's billing software.

The facts of this case demonstrate Harvey's apathy toward residents in financial distress in general and Ms. Thomas in particular. On the day of the disconnect, the Water Department refused to accept or address the Discharge Order in any way; the City employees took Ms. Thomas's information and did nothing. In the months that followed, the Water Department received counsel multiple times that it could not bill for or disconnect services on account of discharged debts, yet it never reversed course on Ms. Thomas's account, even after she followed up on September 3, 2025. The City's response was to ask her to send them yet another copy of her Discharge Order for their review—*after* the City had received *at least ten* copies of Ms. Thomas's Discharge Order through formal service and at Ms. Thomas's first in-person visit in May 2025 (where City employees refused to accept the copy she brought them). Ms. Thomas (again) did as she was asked promptly, and Harvey staff were (again) advised by outside legal counsel that they needed to act. (DX 18) But when Ms. Gandarilla asked Ms. King to adjust Ms. Thomas's account and Ms. King responded she didn't know what to do, Ms. Gandarilla abandoned the task and never ensured water was restored. (Tr. 116–121) It wasn't until four months later, on February 6, 2026—the business day before the Show Cause hearing—that Ms. Gandarilla circled back to the September 2025 email string discussed earlier between the City of Harvey and its outside counsel. (DX 18 at COH 421) She asked "[w]as this adjustment ever completed"? (*Id.*) Ms. King responded "I didn't know anything about this bankruptcy" and "I've never adjusted an account with a bankruptcy." (*Id.*) So after Harvey had already turned off Ms. Thomas's water improperly for four months, an additional five months transpired where Harvey knew that Ms. Thomas's account needed to be addressed, but it did nothing.[4]

---

[4] Ms. King was out of the office due to a medical issue from September 17 to December 15, 2025. (Tr. 92) That doesn't excuse others at the Water Department from dealing with the issue, or Ms. King from dealing with it in the two weeks between September 4 and 17 or the nearly two months between December 15 and February 6.

I find it particularly troubling that nothing has changed despite my ruling on February 9, 2026, in a hearing that the City's counsel attended, that Harvey needed to have policies in place to ensure that it treats residents who are or were debtors in a way that complies with the law. Harvey appears to have no interest in complying with federal law. Even as of the day of trial, July 27, 2026, the Harvey Water Department's supervisor testified that if she received a bankruptcy notice, or saw in Harvey's database a notation that a resident was in bankruptcy, she'd have no idea what that means or what to do about it. (Tr. 50–51, 54) And the Water Department's former Manager—the most senior employee at the time—testified that she was never informed of the expectation I voiced at the Show Cause hearing that the City of Harvey have bankruptcy procedures in place and seemed to disavow responsibility for legal compliance. (Tr. 138–139 ("I am not a part of that.")) Harvey hasn't implemented any policies or training about bankruptcy—even since turning Ms. Thomas's water back on. (Tr. 74–75)

Harvey's counsel understands the seriousness of the situation. He advised at closing argument that the City "acknowledges that there will likely be punitive damages potentially assessed in this case, and that would likely incentivize the City to [solve the problem]." (Tr. 193) The City asks, though, that "given the City's current economic constraints and difficulties in providing essential services to residents in light of its financial situation," the Court exercise "some degree of leniency or consideration in the assessment of those damages." (*Id.*)

III.

The discharge injunction, 11 U.S.C. § 524, may be the most important section of the Bankruptcy Code. I have written before that:

> No former debtor should have to defend against a discharged claim—period. Willful violators will at a minimum be required to pay all of the discharged debtor's costs and attorneys' fees, and I will consider imposition of additional damages where appropriate, too. *See Taggart v. Lorenzen*, 587 U.S. 554, 557

> (2019) ("[A] court may hold a creditor in civil contempt for violating a discharge order if there is *no fair ground of doubt* as to whether the order barred the creditor's conduct." (emphasis in original)); *In re Terrell*, 614 B.R. 300, 306 (Bankr. N.D. Ill. 2020) (ordering sanctions equal to the debtor's attorneys' fees). Every creditor should be on notice that violations of the discharge injunction will be punished—severely if and when severe sanctions are appropriate.

*In re Servin*, No. 16-39971, 2025 WL 863298, at *1 (Bankr. N.D. Ill. Mar. 18, 2025). Here, the City of Harvey candidly admitted during closing argument that it violated the discharge injunction. (Tr. 188) It did. Flagrantly and repeatedly. When Ms. Thomas received her discharge she became protected by my Discharge Order and the injunction imposed by Section 524 of the Bankruptcy Code from, among other things, attempts to collect discharged debts as a personal liability. 11 U.S.C. § 524(a)(2). The City violated both in two ways:

*First*, the City issued ordinary course bills to Ms. Thomas that demanded payment of the discharged debt and threatened to disconnect her water absent payment. (DX 9–16) None of the post-petition bills acknowledged Ms. Thomas's status as a debtor, segregated pre-petition from post-petition billings, or attempted to limit the City's recovery efforts to *in rem* remedies. The Seventh Circuit has confirmed that payment collection letters containing delinquency notices are *in personam* efforts to collect on a prepetition claim. *See Reedsburg Util. Comm'n v. Grede Foundries, Inc. (In re Grede Foundries, Inc.)*, 651 F.3d 786, 790 (7th Cir. 2011) (municipal utility "violated the automatic stay by sending delinquency notices to" the debtor postpetition); *see generally Flint v. West Virginia State Tax Dep't (In re Flint)*, 557 B.R. 461 (Bankr. N.D.W. Va. 2016) (statements sent by state taxing agency that were "rife with words of collection" appeared to demand payment of discharged debts); 4 COLLIER ON BANKRUPTCY ¶ 524.02 (16th 2026) (Section 524(a)(2)'s "broad injunction . . . extends to all forms of collection activity, including letters, phone calls, threats of criminal proceedings or other adverse actions intended to bring about repayment"). Each bill was a new violation.

*Second*, the City turned off Ms. Thomas's water, by its own admission, on account of the non-payment of prepetition amounts by the discharged debtor. (Dkt. No. 35 at ¶ 13) Refusing to provide go-forward service on account of non-payment of discharged amounts is an effort to collect the debt from the contract holder personally and a willful discharge violation. *See, e.g.*, *In re Sanchez*, 545 B.R. 55 (Bankr. D.N.M. 2016). The City of Harvey initially tried to defend its actions by asserting it was exercising the *in rem* remedies available under its Municipal Code (Dkt. No. 35 ¶¶ 13-15), which permits the superintendent of the Water Department to record a lien on the serviced property after bills are past-due for at least sixty days. *See* Harvey Municipal Code § 13-04-290(A). There is no evidence in the record of Harvey properly recording a lien, but I need not reach whether Harvey had a valid secured claim as its actions plainly were not confined to *in rem* remedies. *See, e.g.*, *Palazzola v. City of Toledo (In re Palazzola)*, No. 09-37696, 2013 WL 4462568, at *5 (Bankr. N.D. Ohio Aug. 19, 2013) (finding that the utility's invoices showing a discharged debt as "due" are "attempts to collect the debt as a personal liability . . . aimed squarely at demanding and getting [debtor] as 'the contract holder' to pay the charges" and are not mere enforcement of a lien that survived the discharge).

In any event, internal privileged emails that Harvey voluntarily produced and introduced into evidence in an effort to show good faith (*see* Tr. 11–13) demonstrate that Harvey always *knew* that its "*in rem*" argument was incorrect. Indeed, Harvey had repeatedly received legal advice in connection with residents' bankruptcies confirming that it could not turn off residents' water on account of pre-petition debt. (DX 4 ("The City should note that it cannot terminate her water service or place any liens on the property for pre-petition past water bills now that a petition is pending."); *see also* DX 3 (outside counsel advising that "we cannot shut off [water] for that amount due as [of] that [petition] date"), DX 5, DX 18 & Tr. 107–111, 115–16, 168

(Water Department manager agreeing that "you were informed that the bankruptcy petition prevented the City from disconnecting the service for pre-discharge bills")) So I disagree with the City's counsel; these emails don't suggest good faith at all. What they demonstrate is that the City repeatedly received sound legal advice to ensure it honored the Bankruptcy Code. (DX 5; Tr. 108–09, 168) Harvey simply ignored the legal advice that it received.

Harvey's violations of this Court's Discharge Order and the statutory discharge injunction continued for nine months. Every month another bill went out. And over that period, there were multiple inflection points where the City should have promptly rectified the violations; it did not. The City eviscerated the fresh start Ms. Thomas should have enjoyed, in clear contempt of the Discharge Order and Section 524 of the Bankruptcy Code.

The Bankruptcy Code demands more than ad hoc responsiveness when an entity (like a utility) regularly services customers who file for bankruptcy. Because they will inevitably encounter customers protected by Sections 362 and 524, utilities *must* have procedures in place to ensure compliance with the Bankruptcy Code, just as they would for any other federal law to which they are subject. If they don't, and they violate people's rights, they will be sanctioned. *See Covington v. Ill. Am. Water Co. (In re Covington)*, No. 22-ap-00134, 2023 WL 3573751, at *3 (Bankr. N.D. Ill. May 19, 2023) ("Creditors are obligated to maintain procedures to ensure that they do not violate section 524, and may be held liable for damages and attorney's fees if they do not."), *aff'd*, No. 23 C 3324, 2024 WL 6864185 (N.D. Ill. Apr. 24, 2024), *aff'd*, No. 24-1929, 2026 WL 184217 (7th Cir. Jan. 23, 2026).[5]

[5] Utilities can find guidance for navigating the Bankruptcy Code from mortgage servicers, who have established systems in part to comply with the Truth In Lending Act's implementing regulation, Regulation Z. *See* 12 C.F.R. § 1026.41. Mortgage servicers who choose to send statements to borrowers in bankruptcy issue separate, modified statements that (a) include clear language "identifying the consumer's status as a debtor in bankruptcy," (b) clearly separate post-petition payment amounts from any pre-petition arrearage, and (c) include a disclaimer "that the periodic statement is for informational purposes only." *Id.* at § 1026.41(f).

The City of Harvey should immediately work with its outside bankruptcy counsel to develop, adopt, and implement clear procedures for all departments that provide services to resident customers. These procedures will have to ensure, at the very least, that bankruptcy-related mailings are actually received and reviewed by the applicable department(s), that customer accounts are flagged when the customer is benefiting from the automatic stay or from a discharge, that the City's billing software is upgraded to automate or facilitate changes in billing (like segregating and, when applicable, writing off prepetition amounts) when a bankruptcy flag is enabled,[6] that safeguards are in place to make it nearly impossible to turn off the water on account of discharged debts, and that all employees are adequately trained to implement appropriate, legally compliant procedures. A utility that does this would be far less likely to be sanctioned (or would be sanctioned less) if there was a good faith mistake. A utility that does nothing will inevitably violate the Bankruptcy Code and will be sanctioned.

The discharge violations that occurred here are glaring, but it gets worse. The City of Harvey also appears to have failed to comply with its own Municipal Code and, in doing so, denied Ms. Thomas due process. Section 13-04-280 of the City of Harvey's Municipal Code,[7] entitled "Shutting off water," provides that the superintendent of the Water Department shall notify the customer "immediately" upon a billing statement becoming delinquent and prior to any termination of service. That notice is required to be sent by certified or registered mail, and must include both the proposed termination date for services and "a brief description of the procedure for challenging the termination." That procedure, set out in Harvey's Municipal Code,

---

[6] I note that the City of Harvey contracts with BS&A for its billing software. (Tr. 51) BS&A is a sophisticated provider of software for thousands of local governments, including municipal utilities. BS&A Software, *Company Overview*, https://www.bsasoftware.com/about/company-overview/ (last visited Sept. 12, 2026). I expect that BS&A already has software with the necessary bankruptcy features and the City of Harvey simply needs to upgrade to an existing product.

[7] Available at https://ecode360.com/47904913#47904956.

provides the customer with ten days to challenge the termination of water service and requires the superintendent to schedule and hold a hearing on the challenge to water termination before rendering a final decision. The customer also has the right to appeal a final decision.

Though the evidence did not focus on Harvey's compliance with its own Code, it seems clear that Harvey's Water Department did not send Ms. Thomas notice in the manner required. Ms. King testified that notices of disconnection are given simply through language added to the standard monthly water bill. (Tr. 79) While there apparently is "additional billing information" on the back of the bill, Ms. King testified that is literature on "how to pay the water bill" (Tr. 80), which doesn't capture a procedure for challenging termination. Moreover, the language added to the standard bill is "FINAL NOTICE: WATER SERVICE WILL BE DISCONNECTED IF NOT PAID BY 25TH OF THIS MONTH;" that same language appeared on subsequent bills for several months after Ms. Thomas's water service was already terminated. (DX 10–13) This boilerplate clearly does not satisfy the requirements of Harvey's Municipal Code—it sets a deadline for payment to avoid disconnection (which itself was illusory as Harvey jumped the gun by four days when disconnecting Ms. Thomas), but does not identify a proposed date for disconnection or appear to alert the customer to their challenge period or the procedure by which they can make a challenge, and it is delivered to customers via their regular bill, not an immediate notification sent by registered or certified mail.

It is well-settled that before a municipal utility can terminate service for non-payment, it must notify the customer of the asserted delinquency, afford notice reasonably calculated to apprise residents of the administrative procedure to contest the billing, and provide "an opportunity to present their complaint to a designated employee empowered to review disputed bills and rectify error;" failure to do so deprives the customer of "an interest in property without

due process of law." *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 18, 22 (1978) ("[S]ome administrative procedure for entertaining customer complaints prior to termination is required to afford reasonable assurance against erroneous or arbitrary withholding of essential services."); *see also Gates v. City of Chicago*, 623 F.3d 389, 398 (7th Cir. 2010); *Sterling v. Vill. of Maywood*, 579 F.2d 1350, 1353 (7th Cir. 1978) (citing cases for the proposition that utility customers have a "constitutionally protected property interest in continued service"). Courts assessing whether a municipal utility has adequate procedures to safeguard a private property interest (such as the contractual right customers have to their water service, *see Brooks v. Village of Wilmette*, 72 Ill.App.3d 753, 756 (1st Dist.1979) (relationship between customer and municipal utility is essentially one of contract)) balance three factors set out by the Supreme Court in *Mathews v. Eldridge*: (a) "the private interest in question," (b) "the risk of an erroneous deprivation and the value, if any, of potential additional or substitute safeguards," and (c) "the Government's interest, including the burden of any changes in its procedures." *Stevo v. Frasor*, No. 07 C 6647, 2011 WL 253963, at *7 (N.D. Ill. Jan. 3, 2011), *aff'd*, 662 F.3d 880 (7th Cir. 2011) (citing *Mathews v. Eldridge*, 424 U.S. 319, 334–35 (1976)).

The process laid out in the City of Harvey's Municipal Code likely would satisfy due process, but based on its own current and former employees' testimony, the City is evidently in perpetual violation of its own Code. The City's actual practice makes erroneous deprivation of a critical property interest a certainty. "Utility service is a necessity of modern life; indeed, the discontinuance of water or heating for even short periods of time may threaten health and safety." *Memphis Light*, 436 U.S. at 18. The testimony suggests that Harvey may be violating its citizens' rights on a regular basis. The review of Harvey procedures described above would do well to also ensure City Hall's departments comply with the dictates of the City's own Code.

IV.

The City of Harvey's refusal to comply with federal law and the Discharge Order for nine months was objectively unreasonable and willful. *Taggart*, 587 U.S. at 557 ("[C]ivil contempt may be appropriate if there is no objectively reasonable basis for concluding that the creditor's conduct might be lawful."); *In re Sorensen*, No. 11-33448, 2022 WL 2718871, at *5 (Bankr. N.D. Ill. July 13, 2022) ("[A] willful violation 'requires that the offending party both violated the court's order and had actual knowledge that a bankruptcy is underway or has ended in a discharge.'" (*quoting In re Radcliffe*, 563 F.3d 627, 631 (7th Cir. 2009))) The record establishes clearly that the City knew of Ms. Thomas's bankruptcy, knew what the law required, and simply chose not to follow it. The evidence also demonstrates that Harvey has a de facto policy of ignoring bankruptcy law altogether, which did not change in the months between my ruling that the City violated the discharge injunction (Dkt. No. 43) and the damages hearing (Tr. 42–44). The result is that a Harvey resident was without water in her home for nine months and was forced to undertake Herculean efforts to procure water in a valiant effort to preserve her health and the safety and habitability of her home. The City's unrelenting and compounding discharge violations constitute civil contempt. *See Sorensen*, 2022 WL 2718871, at *9 (the creditors' "conduct was so obviously wrong and unsupported by any legal authority that the Court finds it patently unreasonable from the inception and throughout these proceedings"); *McLean v. Green Point Credit LLC (In re McLean)*, No. 12-11045, 2013 WL 5963358, *8 (Bankr. M.D. Ala. Nov. 8, 2013) ("A willful violation of the discharge injunction is an act of contempt.").

The question now is what damages will appropriately remedy the violations. *See Taggart*, 587 U.S. at 560 ("Under traditional principles of equity practice, courts have long imposed civil contempt sanctions to coerce the defendant into compliance with an injunction"

(quotation marks omitted)); *United States v. Dowell*, 257 F.3d 694, 699 (7th Cir. 2001) ("Sanctions for civil contempt are designed either to compel the contemnor into compliance with an existing court order or to compensate the complainant for losses sustained as a result of the contumacy."). Ms. Thomas is doubtlessly entitled to any actual damages she proved up. And in the Seventh Circuit, "courts are permitted to award punitive damages for violations of the discharge injunction, specifically where the creditors' conduct was particularly egregious." *Sorensen*, 2022 WL 2718871, at *12; *see also Cox v. Zale Delaware, Inc.*, 239 F.3d 910, 916 (7th Cir. 2021) (agreeing that under extreme facts, "[t]he victim of a violation of the statutory injunction might even be able to obtain punitive damages"); *Vazquez v. Sears, Roebuck & Co. (In re Vazquez)*, 221 B.R. 222, 230–31 (Bankr. N.D. Ill. 1998) ("[A] willful violation of the discharge injunction is an intentional tort" and "[p]unitive damages are awarded in response to particularly egregious conduct for both punitive and deterrent purposes"). Many courts have done so. *See, e.g., Romanucci & Blandin, LLC v. Lempesis*, No. 16 C 9710, 2017 WL 4401643, at *7 (N.D. Ill. May 4, 2017) (citing cases). And if any facts justify punitive damages for a discharge violation, it is the set of facts present here.

A.

Ms. Thomas testified that she spent $500 on bottled water, which she used to cook with during the nine-month period she was without running water. (Tr. 27–28) That sum is awarded; it is the direct result of the City of Harvey's violation of the discharge injunction.

Ms. Thomas also seeks damages for emotional distress suffered during the nine-month period she had to live without running water in her home. I found her testimony very credible. And it was understated. Ms. Thomas didn't exaggerate symptoms or try to fake an injury. She noted that her ulcers flared up (Tr. 31) and that she fell down while carrying the five-gallon jugs

of water into her home (Tr. 29–30), but didn't overstate any resulting pain (even when prompted) or seek compensation for any associated medical costs, like medication or a doctor visit. Ms. Thomas also did not dwell on the physical toll that procuring and hauling sixty gallons of water every few days must have wrought. (Let alone the imposition on her time; one readily comprehends that it would take a sexagenarian a long time to bring twelve five-gallon jugs (the kind used for office water coolers) to her car, drive the ten-to-twenty minutes to her friends' homes (Tr. 27), fill up the twelve large jugs, haul each jug one-by-one to her car, drive home, and then lug each into her house.) Ms. Thomas described the anxiety and stress she was put under by the City's violations, her worry over the damage to her home that could happen if the pipes froze, and the impact that it had on her personal life, her sleep, and her health. She told me that it was "rough" (Tr. 33)—and I have no trouble believing that. Any reasonable person living in their home without running water for a sustained period would suffer significant emotional distress. As damages for Ms. Thomas's emotional distress, counsel asks me to award $150 for each day with which she was without water, for a total of $40,950 (Tr. 179–80).

Section 105(a) authorizes me to issue any order necessary or appropriate to carry out the provisions of the Bankruptcy Code, including the discharge imposed by Section 524(a)(2) that operates as an injunction against all acts to collect a discharged debt. In *Taggart*, the Supreme Court explained that these provisions bring with them the "old soil" that has long governed how courts enforce injunctions, including the "potent weapon" of contempt. 587 U.S. at 560. "Actual damages [for noncompliance with the Section 524 injunction] may include damages for emotional distress, which can be just as real and sometimes far more serious than damage to property interests." *Covington*, 2023 WL 3573751, at *3; *cf. Covington*, 2026 WL 184217, at *2 (finding the bankruptcy court did not commit clear error in declining to award emotional distress

damages for a water utility's discharge violation because the debtor failed to sufficiently prove his case, implying that the Seventh Circuit agrees emotional distress damages are available to compensate for Section 524 violations where, as here, the debtor proves such damages up). And numerous courts across the country have awarded actual damages for the emotional distress resulting from creditors' violations of statutory bankruptcy injunctions. *See, e.g.*, *Romanucci & Blandin*, 2017 WL 4401643, at *6 ("[B]ankruptcy courts have the authority to award remedial and compensatory damages in the form of sanctions for violations of the discharge injunction. *In re Andrus*, 184 B.R. 311, 315 (Bankr. N.D. Ill.), *aff'd*, 189 B.R. 413 (N.D. Ill. 1995). Therefore, emotional distress damages, which are compensatory in nature, should be available as sanctions for a violation of the discharge injunction."); *Locali Mgmt. Grp., LLC v. Rodriguez (In re Rodriguez)*, -- B.R. --, 2026 WL 2014307, at *9 (B.A.P. 9th Cir. July 10, 2026); *Ocwen Loan Servicing, LLC v. Marino (In re Marino)*, 577 B.R. 772, 789 (B.A.P. 9th Cir. 2017); *In re Minarik*, 675 B.R. 158, 173 (Bankr. E.D. Pa. 2025); *McLean*, 2013 WL 5963358, at *9–10; *Am.'s Servicing Co. v. Schwartz-Tallard*, 438 B.R. 313, 323 (D. Nev. 2010). And last year, the Seventh Circuit affirmed an award of emotional distress damages following an opposing party's violation of the discharge injunction that resulted in the debtor's arrest and incarceration. *See Sterling v. Southlake Nautilus Health & Raquet Club, Inc. (In re Sterling)*, 140 F.4th 924, 932 (7th Cir. 2025) (awarding $6,000 for each day the debtor was improperly jailed, plus lost wages).

Writing for the *Sterling* panel, Judge St. Eve observed that "a compensatory damages award in a civil contempt proceeding resembles a tort judgment for compensatory damages, and tort principles may apply" (*id.* at 934) and reminded that "[b]ased on this analogy, we have held that a court typically must award compensatory damages as a civil contempt sanction if the complainant proves that the defendant's actions in violation of a court order caused her injury—

that is, as in a tort action, a court has limited discretion to deny relief." *Id.* at 929 (noting "[t]hese limits on a court's discretion distinguish an award of compensatory damages in a civil contempt proceeding from traditional equitable relief" and contrasting it to the "broad discretion courts have to shift attorney's fees as a contempt sanction"). Drawing on *Thompson v. Cleland*, 782 F.2d 719, 722 (7th Cir. 1986), the Circuit panel observed that if a complainant proves that the defendant's violation of a court order caused her injury, "the court typically must impose a compensatory contempt fine." 140 F.4th at 932 (quoting *NLRB v. Neises Construction Corp.*, 62 F.4th 1040, 1057 (7th Cir. 2023)). The Court agreed that the harm suffered from the debtor's arrest and weekend in jail was similar to that experienced by victims of false arrest or false imprisonment. *Id.* Because plaintiffs in those cases can recover compensation for intangible injuries like emotional distress, the debtor could recover compensation for the same injuries from the discharge violator. *Id.* at 933–34.

Ms. Thomas has established that Harvey's termination of her water services in violation of the discharge injunction was the direct, proximate cause of various injuries, including stress and anxiety, and the physical symptoms they wrought. As Ms. Thomas points out in her post-trial brief, the harms she suffered are similar to (if not worse than) the harms suffered by the plaintiffs in *Van Brocklin v. Gudema*, who sued a neighboring farm for negligence that resulted in their loss of a potable water supply. 50 Ill. App. 2d 20, 27 (Ill. App. Ct. 1964). The Illinois Appellate Court agreed that evidence showed the defendant's negligence was the proximate cause of the harm and, comparing the situation to nuisance cases, concluded that the law permits "recovery for the elements of inconvenience and discomfort entailed in the temporary loss of a water supply caused by the negligence of another." *Id.* at 26–28. The Court observed that "[f]or eight months, [the plaintiffs] were deprived of this valuable asset, being forced to drink water

from a filling station and take 'sponge baths.' We do not overlook the fact that the eight month period of contamination included all of the hot summer months. To relegate the plaintiffs to a recovery of lost rental value or the value of the time spent in transporting the water would be to indulge in fiction." *Id.* at 27; *see also Mayer v. Chicago Mech. Servs., Inc.*, 398 Ill. App. 3d 1005, 1007–08 (2010) ("Where the injury is to physical comfort and results in deprivation of the comfortable enjoyments of a home, the measure of damages is . . . compensation for such physical discomfort, and deprivation of the use and comforts of the home."). Here, Ms. Thomas suffered through both the dog days of summer and a frigid Chicago winter, and her water was not just non-potable—it was not running at all. All of this was caused by Harvey's negligence and breach of both its own Municipal Code's requirements and those of the Bankruptcy Code.

Similarly, landlords who shut off utility services in a bid to harass tenants into paying rent risk a variety of tort claims concerning the interference with property rights, such as improper or constructive eviction, breach of the warrant of habitability or the covenant of quiet enjoyment, and intentional or negligent infliction of emotional distress. *See, e.g.*, *Erlach v. Sierra Asset Servicing, LLC*, 226 Cal. App. 4th 1281, 1299 (2014) ("[T]he *negligent* infliction of emotional distress-anxiety, worry, discomfort-is compensable without physical injury in cases involving the tortious interference with *property rights*." (emphases in original)) (landlord turned off water, gas, and electricity services to "freeze out" tenants); *Locke v. Austin*, 1999 Mass. App. Div. 257 (Dist. Ct. 1999). A utility's termination of service to coerce customers into payment results in the same harms. As the Supreme Court recognized, "[a]lthough utility service may be restored ultimately, the cessation of essential services for any appreciable time works a uniquely final deprivation." *Memphis Light*, 436 U.S. 1, 20.

There is no doubt in my mind that the City caused Ms. Thomas serious emotional distress for a sustained period. Given the clear violation of the discharge injunction and equally obvious suffering it caused, a financial award to compensate for her emotional distress is appropriate. Indeed, in *Covington*, a Seventh Circuit panel remanded a bankruptcy court's refusal to award emotional distress damages for a discharge violation, finding that it was error to suggest that a lack of medical care undermined a petitioner's case for emotional distress damages. 2026 WL 184217, at *2; *see Deloughery v. City of Chicago*, 422 F.3d 611, 620 n.5 (7th Cir. 2005) (plaintiff need not consult a mental health professional to establish emotional distress). Generalized complaints are insufficient, but awards "can be supported, in certain circumstances, solely by a plaintiff's testimony about his or her emotional distress." *Tullis v. Townley Eng'g & Mfg. Co.*, 243 F.3d 1058, 1068 (7th Cir. 2001). This is one of those circumstances.

In *Tullis*, the Seventh Circuit affirmed an award of emotional distress damages of $80,185, despite the lack of physician testimony or testimony from a corroborating lay witness. *Id.* at 1068. There, the plaintiff testified he felt degraded when laid off and back-stabbed when his employer opposed his unemployment claim, and described borrowing money from family and friends, falling behind on child support, being unable to buy his children school clothes, and having his lights and phone shut off. *Id.* at 1067. I found Ms. Thomas's testimony at least as compelling as that described in *Tullis*. Again, she was not the emotive type, but I felt her pain in describing the challenges in navigating a life without running water for nine months. This isn't the 1920s. Running water is not a luxury. Living without it would cause any person tremendous stress and anxiety. It is hard to imagine the demands of physically dragging into one's house the water needed to drink, use toilets, and safely maintain a home in five-gallon jugs every day for nine months. Or the toll of relying on the kindness of family and friends to regularly open their

own homes to you to bathe and to provide water at their own cost over such a long period. I believe that Ms. Thomas suffered material emotional distress from these impositions that were a direct and obvious result of the City of Harvey's conduct.

Being without running water is surely not the same as being improperly incarcerated, but if $6,000 is an appropriate per diem amount for the distress caused by an unjustified, weekend-long incarceration (as in *Sterling*), then $150 cannot be an unreasonable per diem for the distress caused by being deprived of water for three quarters of a year. Again, these facts are far worse than those in *Covington*, where the debtor asserted distress from receiving bills for discharged debt only, and water disconnection never happened. 2026 WL 184217, at *2. Here, there was obvious and demonstrated distress, for a good reason: the physical termination of running water to an occupied residence, affecting drinking, cooking, bathing, sanitation, and the habitability of the debtor's home. $150 per day seems a modest estimate of the cost to Ms. Thomas's psyche from being without running water for nine months. That sum is awarded; the City of Harvey must pay Ms. Thomas $40,950 in additional compensatory damages, $150 for each of the 273 days she was improperly cut off from running water.[8]

B.

Punitive damages are reserved for rare cases with extreme misconduct. *See Sorensen*, 2022 WL 2718871, at *12 ("[U]nder existing Seventh Circuit precedent, courts are permitted to award punitive damages for violations of the discharge injunction, specifically where the creditors' conduct was particularly egregious."); *Vazquez*, 221 B.R. at 230 (awarding punitive damages equal to 10 times the actual damages awarded for a discharge injunction violation that

---

[8] Ms. Thomas asks for an additional $20,000 in damages for the loss of habitability and quiet enjoyment. (Dkt. No. 66 at 6–7, citing, *e.g.*, *Van Brocklin*, 50 Ill. App. 2d at 25) While this request is not unreasonable, I don't see it as a separate category of damages under the facts here. So the extent I would allow damages for loss of habitability, this request is encompassed within the damages I am awarding for emotional distress.

"simply boggles the judicial mind and shocks the conscience," as the creditor "need[ed] proper incentive to discontinue this unlawful practice"). And if any misconduct warrants punitive damages, the City of Harvey's conduct here does. Turning off a resident's water is a serious thing: before disconnecting water service, a utility should be certain it has the legal right to do so. The City here did it without much thought, in a heartbeat—even before the date it threatened—and in blatant violation of its own Municipal Code, a Discharge Order, and the Bankruptcy Code. And the City then ignored the issue for *nine months* despite Ms. Thomas's repeated pleas and its own legal counsel's advice that what it did was illegal. No one can be allowed to so obviously flout federal law and a court order without real consequence.

After considering the evidence at trial, the one uncertainty I had was whether, as a municipality, the City of Harvey could be sanctioned with punitive damages at all. So while neither the City nor Ms. Thomas raised the issue prior to (or at) trial, I raised it *sua sponte*, asking the parties to address this threshold question in post-trial briefing. (*See* Dkt. No. 64) After considering the relevant law, I conclude that the Bankruptcy Code and federal common law permit punitive damages in this case. The only way the City of Harvey could avoid punitive damages under these extreme facts is if such damages were categorically unavailable against—and immunity unwaivable by—municipalities in every case. I don't think that's the law.

Section 106(a) of the Bankruptcy Code provides that "[n]otwithstanding an assertion of sovereign immunity, sovereign immunity is abrogated as to a governmental unit to the extent set forth in this section." Section 106(a)(3) continues, "[t]he court may issue against a governmental unit an order, process, or judgment under such sections or the Federal Rules of Bankruptcy Procedure, including an order or judgment awarding a money recovery, but not including an award of punitive damages. Such order or judgment for costs or fees under this title or the

Federal Rules of Bankruptcy Procedure against any governmental unit shall be consistent with the provisions and limitations of section 2412(d)(2)(A) of title 28."

The Eleventh Amendment bars private parties from suing a nonconsenting State in that State's own courts or in the courts of another State. In *Katz*, the Supreme Court noted that at the time of its ratification, States agreed "not to assert any sovereign immunity defense they might have had in proceedings brought pursuant to Laws on the subject of Bankruptcies." *Central Virginia Community College v. Katz*, 546 U.S. 356, 377 (2006) (internal quotations omitted). Thus, Congress is empowered to treat States like any other creditor in enacting laws concerning bankruptcy—though it can distinguish States if it so chooses. *Id.* at 379.

The first clause of 11 U.S.C. § 106(a) makes clear that its limitations are predicated on a legitimate assertion of sovereign immunity. And while *states* have sovereign immunity, the Supreme Court confirmed earlier this year that sovereign immunity "does not extend to 'lesser entities,' such as 'municipal corporation[s] or other governmental entit[ies]' that are not 'arm[s] of the State.'" *Galette v. N.J. Transit Corp.*, 607 U.S. 509, 520 (2026) (quoting *Alden v. Maine*, 527 U.S. 706, 713 (1999)); *see also DuPage Reg'l Off. Of Educ. v. United States Dep't of Educ.*, 58 F.4th 326, 337 (7th Cir. 2023) (holding that while "arms of the state" are generally immune from suit in federal court, "[t]his immunity does not extend, however, to other political or municipal entities created by states"). It is now a "firmly established rule" that municipalities created as legally separate entities from their home State are not arms of the State. *Galette*, 607 U.S. at 522; *see also Lincoln County v. Luning*, 133 U. S. 529, 530–531 (1890); *Moor v. County of Alameda*, 411 U. S. 693, 719–721 (1973); *Alden*, 527 U.S. at 756. The City of Harvey exercises all hallmarks of legal separateness including independent powers to sue and be sued, hold property, enter into contracts, and incur debt. *Galette*, 607 U.S. at 524 ("The clearest

evidence that a State has created a legally separate entity is that it created a corporation with the traditional corporate powers to sue and be sued, hold property, make contracts, and incur debt.") Thus, Harvey is a "lesser entity" that has no sovereign immunity from suit in federal courts.

In my view, that is the end of the Section 106(a) inquiry. It's true that some judges have concluded that Section 106(a)(3) prevents the assessment of punitive damages against any governmental unit, even where the entity does not generally enjoy the privileges of sovereign immunity.[9] I respectfully disagree. That interpretation reads the introduction to Section 106(a) out of the statute. Section 106(a) begins with the phrase "notwithstanding an assertion of sovereign immunity . . ." If a governmental unit has no sovereign immunity to assert in the first place, the ways in which that immunity is abrogated are not relevant. *See Coats v. Vawter (In re Coats)*, 168 B.R. 159, 164 (Bankr. S.D. Tex. 1993) (Section 106 ("only pertains to government units which have sovereign immunity to begin with"). So, Section 106(a)(3) does not prohibit punitive damages here and, for the same reasons, its limitation on legal fees does not apply.

[9] In *Cordova*, Judge Barnes lays out a thoughtful analysis of Supreme Court and Seventh Circuit precedent concerning Section 106(a). *Cordova v. City of Chicago (In re Cordova)*, 635 B.R. 321, 346–349 (Bankr. N.D. Ill. 2023). The City relies on *Cordova* in its post-trial brief. (Dkt. No. 65 at 4–5) But the parties' briefs in *Cordova* all assumed that because a State had sovereign immunity under controlling law, so too did the City of Chicago; no one raised whether the City was entitled to sovereign immunity in the first place. And as I discuss above, sovereign immunity only extends to arms of the State, not legally separate municipalities like cities. The cases relied on by the parties in *Cordova*, and the court's opinion, concern entities that are arms of the State. *See Cent. Virginia Cmty. Coll. v. Katz*, 546 U.S. 356, 360 (2006) ("Petitioners are Virginia institutions of higher education that are considered 'arm[s] of the State' entitled to sovereign immunity."); *In re La Paloma Generating Co.*, 588 B.R. 695, 717 (Bankr. D. Del. 2018), *aff'd sub nom Kravitz v. Cal. State Bd. of Equalization (In re La Paloma Generating Co.)*, 607 B.R. 794 (D. Del. 2019) (California State Board of Equalization); *In re Bulk Petroleum Corp.*, 796 F.3d 667, 679 (7th Cir. 2015) (State of Kentucky); *Toeller v. Wis. Dep't of Corr.*, 461 F.3d 871, 874 (7th Cir. 2006) (Wisconsin Department of Corrections); *Tenn. Student Assistance Corp. v. Hood*, 541 U.S. 440, 443 (2004) ("Tennessee Student Assistance Corporation (TSAC), is a governmental corporation created by the Tennessee Legislature."). So, while I agree with Judge Barnes's analysis, I disagree with its application to a municipality like a city and I decline to apply it here.

The other cases cited by Harvey in its post-trial brief similarly interpret Section 106(a)(3) in the context of governmental units that are not legally separate municipalities. *See, e.g.*, *In re Majors*, 298 B.R. 363, 366–67 (Bankr. S.D. Iowa 2003) (concerning the IRS); *Felton v. USDA-Rural Hous. Serv. (In re Felton)*, 677 B.R. 712 (Bankr. N.D. Miss. 2025) (concerning the USDA); *United States v. Flynn (In re Flynn)*, 185 B.R. 89, 93 (Bankr. S.D. Ga. 1995) (concerning the IRS). For the same reasons, they are inapplicable.

Section 106(a) aside, there is one additional potential barrier to awarding punitive damages in this case. Separate and apart from sovereign immunity, the Supreme Court has recognized a doctrine of municipal immunity from punitive damages derived from federal common law, suggesting that such sanctions should be imposed only where Congress intentionally abrogated such immunity and where immunity is incompatible with public policy. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 259-71 (1981). "The general rule today is that no punitive damages are allowed unless expressly authorized by statute." *Cook County v. U.S. ex rel. Chandler*, 538 U.S. 119, 129 (2003) (quoting *Newport*, 453 U.S. at 260 n. 21).

*City of Newport* concerned municipal liability for punitive damages under 42 U.S.C. § 1983. 453 U.S. at 269. In holding that municipalities are not subject to punitive damages under § 1983, the Supreme Court found no evidence that Congress intended to disturb common law immunity in passing the Civil Rights Act of 1871 and emphasized that the deterrent justification for punitive damages isn't served in the § 1983 context because a large punitive award on a municipality is unlikely to have great impact on the tortfeasors (individual government officials), thus unjustly penalizing the innocent taxpayer. *Id.* at 264–271.

Ms. Thomas asserts that the Bankruptcy Code authorizes punitive damages against municipalities because Congress made governmental units who lacked sovereign immunity subject to the entire Code, including Sections 105 and 524. (Dkt. No. 66 at 9–12) The premise of this argument is sound, but I question whether it leads to the conclusion that Congress abrogated common law immunity from punitive damages that "lesser" municipalities are presumed to have. It is true that to discern Congress's intent in this situation, the Supreme Court has directed me to look beyond the text and examine the legislative history of the statute—a common practice at the time *City of Newport* was decided. It's also the case that in passing the

Bankruptcy Reform Act of 1994 (which amended the relevant parts of Section 106 to the text in force today), proponents were clear that "[o]f course the entire Bankruptcy Code is applicable to governmental units where sovereign immunity is not or cannot be asserted." 140 Cong. Rec. 27693 (1994) (Section-by-Section Description).[10] And the Code in fact provides as much. But that doesn't necessarily answer the question of whether, because Section 106 prohibits punitive damages only by carving them out of the abrogation of sovereign immunity a governmental unit might otherwise enjoy, Congress "expressly authorized" punitive damages against units who lack sovereign immunity. *Chandler*, 523 U.S. at 129 (quoting from *Newport*, 453 U.S. at 260 n.21).

All that said, I do not need to decide today the broader question of whether the Code abrogated common law principles of municipal immunity for punitive damages. As Ms. Thomas points out in her post-trial brief, "immunity is a waivable affirmative defense." *Sung Park v. Ind. Univ. Sch. of Dentistry*, 692 F.3d 828, 830 (7th Cir. 2012). *See also Barnett v. Hous. Auth. of City of Atlanta*, 707 F.2d 1571, 1581 (11th Cir. 1983) (defendant waived municipal immunity from punitive damages); *Chestnut v. City of Lowell*, 305 F.3d 18, 21 (1st Cir. 2002) (agreeing that municipal immunity from punitive damages is waivable). And it is not a defense that Harvey asserted here. Harvey did not claim common law immunity from punitive damages—or any immunity whatsoever—at trial. To the contrary, at trial "the City acknowledge[d] that there likely [would] be punitive damages potentially assessed in this case." (Tr. 193) Harvey's counsel seemingly welcomed the prospect of punitive damages in face of his client's ongoing non-compliance with the Bankruptcy Code (and counsel's advice), noting that punitive damages "would likely incentivize the City" to comply with the Code going forward. (*Id.*) *See Chestnut*,

[10] As I have previously described, it will be truly a rare case where legislative history has an impact on my statutory interpretation *See Rainbolt v. United States Dep't of Educ. (In re Rainbolt)*, -- B.R. --, 2026 WL 1802271, at *8 (Bankr. N.D. Ill. June 22, 2026). But here I am directed to do so by our highest court, *see City of Newport,* 453 U.S. at 264–71, so I will follow its directions.

305 F.3d at 21 ("Certainly if counsel for the City had stood up and said that the City preferred to face punitive damages, it could hardly complain if the judge took the City at its word."). The reality is that any mention of immunity would have completely escaped Harvey had I not raised the possibility of Section 106's application in a *sua sponte* post-trial order (*see* Dkt. No. 64). And even then, the City confined the argument in its post-trial brief to Section 106(a); it doesn't cite *Newport* or *Chandler* or otherwise mention the concept of common law immunity at all. (Dkt. No. 65 at 4–5) So, I find that even if punitive damages were barred by federal common law, Harvey's belated objection to their imposition here was forfeited.

Further, because the common law doctrine against punitive damages for municipalities is premised on avoiding unjustly penalizing innocent taxpayers, I find relevant Ms. Thomas's observation that Harvey's taxpayers will benefit from the compliance that should be spurred by a modest punitive damages award. The extreme violations of the discharge injunction here are attributable not just to the Harvey Water Department, but to the City across the board. The trial testimony suggested that City Hall manages itself in a way that makes it impossible for the Water Department to respect federal law. That's no excuse for the shocking disregard the Water Department displayed here, but it does seem to justify sanctions that reach the City as a whole.

Punitive damages "are aimed at deterrence and retribution." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003) (*citing Cooper Indus., Inc. v. Leatherman Tool Grp., Inc*., 532 U.S. 424, 432 (2001)). When assessing punitive damages, there are "three guideposts: (1) the degree of reprehensibility of the creditor's conduct; (2) the ratio between punitive and compensatory damages; and (3) the amount of punitive damages awarded in other comparable cases as compared to the actual damages suffered in such cases." *In re Franklin*, 614 B.R. 534, 550 (Bankr. M.D.N.C. 2020) (quoting *State Farm*, 538 U.S. at 418).

Punitive damages are appropriate and necessary to ensure that Harvey and other similarly situated creditors pay close attention to bankruptcy matters, take timely action to avoid or cure violations of the discharge injunction, and implement procedures to prevent foreseeable violations of the Bankruptcy Code—and to reduce the burden on courts to enforce what I view as sacrosanct and fundamental bankruptcy protections. "A governmental unit's '[lack] of inclination or willingness to take any steps to prevent further violations of the automatic stay' constitutes willful and wanton disregard of the stay and may warrant an award of punitive damages." *In re Rosa*, 313 B.R. 1, 8 (Bankr. D. Mass. 2004) (quoting *Stucka v. U.S.* (*In re Stucka*), 77 B.R. 777, 783–84 (Bankr. C.D. Cal. 1987)). Given the City's unacceptably slow response after receiving notice of its violation of the federal injunction as to Ms. Thomas and its ongoing lack of procedures to ensure future compliance, punitive damages are precisely (as its own counsel suggested at closing argument) the best way to incentivize the City of Harvey and other similarly situated municipalities to ensure this does not happen again.

While a more severe punitive sanction could easily be justified under these facts, I will—consistent with Ms. Thomas's request in her post-trial brief—find that the City's egregious conduct warrants an award that matches the Debtor's compensatory damages—a punitive damages award of $41,450. The Supreme Court has approved single-digit multipliers of actual damages as sums "more likely to comport with due process." *State Farm*, 538 U.S. at 416. And this amount and ratio of punitive damages to actual damages is materially more conservative than comparable cases. *See, e.g.*, *In re U Lock, Inc.*, 663 B.R. 30, 56 (Bankr. W.D. Pa. 2024) (awarding punitive damages of double actual damages); *In re LeGrand*, 612 B.R. 604, 618 (Bankr. E.D. Cal. 2020) (awarding punitive damages that were two- and one-half times actual damages for post-petition wage garnishment). Importantly, this award reflects the reality that the

City of Harvey repeatedly and cavalierly compounded Ms. Thomas's harm even after being notified of its initial violation of federal law. The City had multiple opportunities to correct course; it seized none of them. In contrast, Ms. Thomas did yeoman's work mitigating her damages and suffering through the consequences of Harvey's neglect. Ms. Thomas's out-of-pocket damages of only $500 for bottled water is surprisingly low—one might expect to see claims for reimbursements to her friends and neighbors who supplied her with thousands of gallons of water (and presumably had to pay for it on their own accounts), medical costs from physician visits or medications after her fall and recurrence of ulcers, or hotel bills from someone without running water in her home in 2026. Likely, Ms. Thomas couldn't afford to outlay some of those costs, and so she never incurred them—to Harvey's benefit. This reality also emphasizes how insidious the City of Harvey's behavior was here, brushing off a woman with little recourse outside of this Court. I commend Ms. Thomas for her restraint and for sticking to proper procedural remedies to address the City's clear non-compliance with the Discharge Order and the Bankruptcy Code; others might be far less patient or cordial in her situation.

*****

Harvey should not be surprised by this result. Again, at closing argument after trial, its counsel "acknowledge[d] that there will likely be punitive damages potentially assessed in this case, and [agreed] that would likely incentivize the City to [solve the problem]." (Tr. 193) Harvey's counsel asked, though, "given the City's current economic constraints and difficulties in providing essential services to residents in light of its financial situation," that I exercise "some degree of leniency or consideration in the assessment of those damages." (*Id.*)

While I appreciate counsel's advocacy, any leniency that I would give Harvey due to its financial condition would not change the result here.

*First*, Harvey had every opportunity to introduce evidence of financial extremis at trial. But it offered none (other than brief testimony about staff layoffs in the Water Department). It's hard to incorporate leniency to address the financial implications of a judgment on a party where that party declines to offer evidence of those financial implications.

*Second*, based on publicly available information, a judgment of the magnitude that I intend to Order here is not one that should unduly burden a municipality of Harvey's size. Harvey has nearly 25,000 residents and 10,000 households.[11] A judgment of this size, to compensate a resident for truly horrific conduct, shouldn't move the needle for a municipality like Harvey—regardless of its degree of financial distress.

*Third*, as its counsel advised, Harvey's distress appears extreme,[12] but the City must comply with federal law. Perhaps Harvey has limited alternatives given its legacy liabilities, limited tax base, and current state law. But while its options are poor, ignoring the Discharge Order and the Bankruptcy Code's statutory injunctions is not one of them. Financial distress doesn't justify a municipality's complete failure to honor federal law. Until and unless it is given

---

[11] Harvey Statistics, *City of Harvey, Illinois*, https://cityofharveyil.gov/community/about-harvey/harvey-statistics (last visited Sept. 17, 2026).

[12] The City had posted a financial update on its website, averring that it was in a "severe financial emergency caused by years of inherited structural deficits, compounded by the state's seizure of city revenues to cover pension obligations." It characterized the situation as a "crisis" and advised that "the structural deficit, pension judgments, and seizure of city revenues by the State Comptroller have now left Harvey without operating cash." After trial and while I was drafting this opinion, the City removed this update from its website, but it is still available on the City's Facebook page (Facebook.com/CityofHarvey). *See* images posted on October 20, 2025, beginning here: https://www.facebook.com/photo?fbid=847657384490444&set=pb.100077385695580.-2207520000 (last visited Sept. 17, 2026).

In 2025 Harvey also sought to invoke parts of Illinois's "Financially Distressed City Law," 65 ILCS 5/8-12-1. But earlier this year, the state declined Harvey's request. *See, e.g.*, "Harvey's request for financially distressed relief rejected by Illinois Department of Revenue," CHICAGO TRIBUNE, April 2, 2026, *available at* https://www.chicagotribune.com/2026/04/02/state-denies-harvey-financially-distressed-relief/ (last visited Sept. 17, 2026). And despite the apparently limited options under state law for Harvey to address its financial liabilities, Illinois has not (yet) opted-in to Chapter 9 of the Bankruptcy Code. So despite Harvey's failure to introduce evidence of its financial distress, I assume for purposes of its argument that, as its counsel suggested during closing argument, the City is in extreme distress given its current and legacy obligations.

a pathway to address its distress, Harvey must find a way to comply with federal law, and courts like this one will continue to enforce the law by rendering judgments consistent with its requirements.

As its counsel argued persuasively at trial, Harvey's financial distress no doubt makes providing services to residents a challenge. But that is not a problem I currently have authority to solve. Instead, my obligation is to enforce the Bankruptcy Code, and the City's egregious violation of the Code's most sacrosanct provision requires this result.

C.

The Seventh Circuit has confirmed that awarding attorneys' fees to victims of discharge violations is standard relief, as in other contempt proceedings, to ensure such claims can be litigated notwithstanding the cost of doing so. *Sterling*, 140 F.4th at 934; *Cox*, 239 F.3d at 916. 11 U.S.C. § 106 does not (as described above) prevent or limit an award of attorneys' fees against a municipality that lacks sovereign immunity, and I have broad discretion to award reasonable fees incurred on account of Harvey's discharge violation. *Sterling*, 140 F.4th at 934.

I also agree with Ms. Thomas that my authority to impose sanctions under Sections 105(a) for violations of Section 524 permits me to award fees to counsel serving *pro bono*. That's particularly the case given that counsel advises that its engagement letter with Ms. Thomas reserved counsel's ability to seek a fee award in its favor. (*See* Dkt. No. 66 at 15 n.6) Judge Rovner's concurring opinion in *Sterling* describes why awarding fees is particularly important to ensure compliance with the Bankruptcy Code in cases like this one:

> [A]n additional factor that the bankruptcy court must have in mind when it []considers the fee award is the unique function such an award serves in enabling a plaintiff to vindicate her rights—here, [the debtor's] crucial right as an individual whose debt has been discharged in bankruptcy to be free from further efforts to collect on the debt. *See In re Castle Home Builders, Inc.*, 520 B.R. 98, 106 (Bankr. N.D. Ill. 2014) (noting that the bankruptcy discharge injunction is a

> critical element of the fresh start afforded to the debtor by the Bankruptcy Code, as is a creditor's respect for such an injunction). Such rights mean little if they can be ignored with impunity. But to enforce one's rights in court requires an attorney, and attorneys are expensive. [The debtor] suffered real injuries as a result of [the] violation of the discharge order . . .. The damages awarded to [the debtor] to compensate her for those injuries were by no measure extravagant (even before being halved to reflect her comparative fault). But the modest victory she achieved demanded a significant expenditure of attorney time nonetheless. Only if the fee award reflects the reality of what it took to achieve the judgment in [the debtor's] favor can it be said that her rights as a debtor have been fully vindicated.

*Sterling*, 140 F.4th at 937 (Rovner, J., concurring).

So I will join other courts that have done so, and award Jenner & Block LLP reasonable fees and costs. The parties are directed to meet and confer to try to reach an agreement on fees—and to potentially resolve this matter in its entirety rather than incurring further fees and costs in litigation over fees and costs. If the parties reach agreement, they should let my chambers know via email and docket a proposed stipulation for my review. If no agreement is reached, Jenner should file a request for documented fees and costs that are reasonable under these circumstances on or before October 16, 2026.[13] The City of Harvey may object in writing to the inclusion of specific fees or costs on or before October 30, 2026. Upon reviewing the parties' submissions, I will enter a final order and judgment, consistent with this opinion and including a fee award.

V.

All municipalities must comply with federal law, and Ms. Thomas deserved better from the City of Harvey. To compensate Ms. Thomas for the harm she endured while her water was improperly shut off for nine months, and to hopefully incentivize the City of Harvey to adhere to federal law going forward, I am awarding Ms. Thomas actual damages of $41,450 ($500 for the

---

[13] Jenner & Block should include in its request for a specific fee award a copy of its engagement letter with Ms. Thomas, as required by Bankr. N.D. Ill. Local Rule 2016-1.

bottled water and $40,950 for emotional distress) and $41,450 in punitive damages. I will also award reasonable fees and costs to Ms. Thomas's attorneys, Jenner & Block LLP.

A final Order and Judgment will issue once a final fee award is determined consistent with the schedule outlined above. The status conference scheduled for September 22, 2026 (Dkt. No. 67), is stricken.

Date: September 17, 2026 By: ______________________

MICHAEL B. SLADE
UNITED STATES BANKRUPTCY JUDGE